IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


EUGENE LAIGON                    :        CIVIL ACTION
                                 :
         v.                      :
                                 :
PHILADELPHIA MENTAL HEALTH        :
CARE CORP., et al.               :        NO. 11-3339


MEMORANDUM

McLaughlin, J.                             April 30, 2013

        The plaintiff, Dr. Eugene Laigon, brings this suit
against his former employers for alleged violations of the Family
and Medical Leave Act ("FMLA"), Americans with Disabilities Act
("ADA"), and the Pennsylvania Human Relations Act ("PHRA").
Laigon argues that his employers violated the FMLA by failing to
pay him his full salary following his return from medical leave
in 2008, even though he had resumed a full work schedule, and
violated the ADA and PHRA by terminating him on the basis of his
disability and without a reasonable accommodation.  The
defendants have moved for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure.

        After holding oral argument, the Court will grant the
defendants' motion.

I.  <u>Summary Judgment Record</u>[1]

The facts described herein are undisputed unless otherwise noted.  Inferences are drawn in the light most favorable to Laigon, the non-moving party.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

A.  <u>Laigon's Employment with the Defendants</u>

Defendant Philadelphia Mental Health Care Corporation ("PMHCC") is a non-profit corporation that has a contract with the City of Philadelphia ("City") to provide a variety of support services to the City and its departments.[2]  Among other things, PMHCC performs fiscal analysis of City policies and programs.  DX C (5/2/12 Borislow Dep.) at 8-9.[3]

PMHCC hired Dr. Laigon as a financial policy advisor on

---

[1] At many times throughout his briefing, Laigon makes factual assertions without citation to evidence in the summary judgment record.  Pursuant to Federal Rule of Civil Procedure 56(e) and this Court's individual protocol, the Court will not take into account such unsupported statements in its consideration of the defendants' motion for summary judgment.

[2] Neither the plaintiff nor the defendants explain how the other named defendant in this suit, PMHCC, Inc., is related to PMHCC.  Because both Laigon and the defendants refer to the two corporations, together, as "PMHCC" and do not otherwise distinguish between the two entities in their factual recitations or arguments, the Court will also refer to PMHCC and PMHCC, Inc., collectively, as "PMHCC."

[3] "DX" refers to the exhibits submitted by the defendants in support of their motion for summary judgment, and "PX" refers to the exhibits submitted by Laigon as part of his opposition to that motion.

October 29, 2001.  DX I (3/9/12 Laigon Dep.) at 21; DX C at 12-
14.  Although PMHCC performed all human resources ("HR")
functions associated with Laigon's job, such as calculating and
disbursing pay and benefits, PMHCC staff did not supervise his
work.  Instead, Laigon reported to two employees of the City in
the City Managing Director's Office, Thomas Sheaffer and Ellen
Steiker.  DX I at 24-27; DX C at 14, 17.  Sheaffer remained
Laigon's supervisor for the entire duration of his employment at
PMHCC.  Steiker supervised both Laigon and Sheaffer until leaving
her job in the Managing Director's Office on October 6, 2008.
DX I at 25.  Laigon's position was also funded by the City.  Id.
at 26; DX C at 17.


    B.    Laigon's First FMLA Leave

        On June 5, 2007, Laigon suffered a fracture to his left
hand when a SEPTA bus door closed on his left arm and leg as the
bus pulled away, dragging him for some distance.  DX I at 28-30,
33-34.  Prior to that incident, Laigon had a pre-existing back
and neck condition that caused him to walk with a cane.  DX E
(12/30/09 Laigon Dep.) at 12.

        The day after the accident, Laigon called Sheaffer and
Karen Holly, an employee in PMHCC's human resources department,
to tell them what had happened.  As a result of the injuries he
had suffered, one week later, on June 14, Laigon submitted to

-3-

PMHCC a formal Request for Family and Medical Leave for the dates June 6 through August 12, 2007.  DX I at 34-35; DX F (6/14/07 PMHCC Request for Family & Medical Leave).  Holly assisted Laigon in obtaining the necessary paperwork.  DX I at 35.

PMHCC issued a response, approving Laigon's request and explaining his rights and responsibilities under the FMLA.  DX G (6/7/07 PMHCC Employer Resp. to Employee).  PMHCC's Policy Manual, which Laigon received when he was first hired and which he agreed to read and abide by, also informed him of his FMLA rights.  DX I at 41; DX J (10/29/01 Mem.).  The manual states that the FMLA entitles an eligible employee to twelve weeks of unpaid medical leave during a twelve-month period and that failure to return to work at the expiration of a FMLA leave of absence "will subject [the leave-taking employee] to immediate termination unless an extension is granted or if compensated by the agencies disability plan."  DX H (PMHCC Policy Manual, Policy 608: FMLA) at 3-4.  A separate provision within the manual provides that "[a]n unpaid leave of absence of up to one year may be granted to regular full- or part-time employees . . . upon request to the Program Director and approval by the Executive Director."  Per the leave-of-absence policy, at the conclusion of the year-long leave, the employee will be "restored to his or her previous position . . . unless economic conditions force the Agency to reduce the work force."  DX BB (PMHCC Policy Manual,

Policy 612: Unpaid Leave of Absence).

C.   Laigon's Return to Work in August 2007

     Laigon wound up remaining on medical leave until
August 29, 2007.  DX I at 33, 38.  According to PMHCC's stated
policy, before an employee returning from medical leave can
resume his job, the employee must provide PMHCC's human resources
department with a physician's Fitness for Duty/Return to Work
Certification form, a specific PMHCC form, clearing the employee
for work.  DX H at 4.  On August 23, 2007, Laigon submitted to
PMHCC's HR department a Fitness for Duty/Return to Work
Certification filled out by his doctor.  The form stated that
Laigon could resume working with restrictions and should limit
himself to two hours of typing per day.  DX L (8/23/07 PMHCC
Fitness for Duty/Return to Work Certification).

     To accommodate the restrictions recommended by Laigon's
doctor, Sheaffer and Holly discussed the possibility of Laigon
coming back to work on a reduced schedule.  Holly also spoke with
Laigon about limiting his work schedule based on his doctor's
advice.  DX CC (8/27/07-8/28/07 E-mails between Sheaffer &
Holly).  At his deposition, Laigon explained how his schedule was
restructured.  According to Laigon, "we altered my hours, by me
coming in at a later time rather than reporting there before
9:00."  Sheaffer and Holly agreed to decrease Laigon's workday

from 7.5 hours to 6 hours and his workweek from 37.5 hours to 30 hours. As a result of his shortened work schedule, Laigon's pay was commensurately reduced by 20%. DX I at 40-41; DX M (9/10/07 PMHCC Payroll Change Notification Sheet).

On August 29, Laigon sent Holly an e-mail, confirming that he had returned to work. PX F (8/29/07 E-mail from Laigon to Holly).

D.    Laigon's Return to Full-Time Status

On September 20, 2007, less than a month after Laigon returned to work on a reduced schedule, his physician signed a form permitting him to return to work without restrictions beginning on September 26, 2007. PX E (9/20/07 Certification). Within one or two business days of receiving the note from his doctor, Laigon gave the medical release to Sheaffer and Ellen Steiker to let them know that he could return to work full-time. DX I at 58-59. At some point, Laigon also had conversations with Sheaffer and Steiker about resuming a full work schedule. Sheaffer informed Laigon that he and Steiker had determined that they did not need him to return to work full-time given the office's current low workload and the fact that there was not then enough funding in the budget to pay him his full salary. Id. at 43-44, 59.

Laigon continued to work on a reduced schedule

throughout the spring, summer, and early fall of 2008. On
October 8, 2008, Sheaffer approached Laigon at his desk and
requested that he immediately return to work at full capacity.
Laigon responded that he had been ready to resume his former work
schedule for some time. He also mentioned to Sheaffer that
certain forms would need to be filed with PMHCC human resources
to return him to full pay. Sheaffer said he would handle
submitting the necessary paperwork. The next day, October 9,
2008, Laigon resumed working on a full-time basis. Laigon did
not at any time submit directly to PMHCC human resources a
Fitness for Duty form or any other note from a medical
professional, releasing him for full-time work. He also did not
inform the PMHCC employees responsible for payroll or anyone else
at PMHCC that he had begun working on a full-time basis. Id. at
46-47, 69.

By the middle or end of November, Laigon noticed that
his pay remained at 80% of his former salary, despite his
resumption of a full work schedule. After making this
realization, Laigon spoke to Sheaffer. He subsequently "kept
nudging" Sheaffer to fix the payroll issue throughout November
and December 2008 when Laigon's pay did not "catch up" to the
hours he was working. Id. at 68-70.

Laigon did not at any time complain to PMHCC about the
mismatch between his pay and his hours. According to Laigon, he

felt that he had previously been "rebuk[ed]" for contacting PMHCC human resources directly and that he should not communicate with that department about "official" issues. The incident to which Laigon refers occurred in September 2007. That month, Laigon received a copy of his yearly performance review, but it incorrectly listed his supervisor as the CFO of Safe and Sound. Laigon had worked with that organization during the preceding year, but had since moved back to a full-time position with the City. When Laigon contacted PMHCC HR personnel to inform them of this change in supervision, they told him that PMHCC needed to speak to Steiker, his current supervisor, about the issue. Laigon continued to engage in e-mail and written correspondence with PMHCC human resources officials into late October 2007. Id. at 25-26, 55-58, 61-63, 66-67, 70.

Throughout this same period, Laigon submitted to Sheaffer multiple requests for paid time off for days in October, November, and December 2008, which Sheaffer then turned in to PMHCC. Those requests stated that Laigon was working six hours a day. Id. at 77-78, 80; DX N (PMHCC Requests for Time Off). When he handed in the first such form, Laigon told Sheaffer that he had listed his schedule as six hours per day to avoid "confusing things," as the paperwork returning him to full salary did not yet appear to have been processed. Sheaffer confirmed that was appropriate, given that he had not yet submitted a payroll change

form to PMHCC on Laigon's behalf.  Sheaffer never told Laigon to change the manner in which his time was recorded on his paid time off requests, and Laigon continued to record that he was working part-time.  Laigon also felt that it was "logical and equitable" to record a six-hour workday on those forms because he had been accruing paid time off based on that reduced schedule.  DX I at 77-79, 119-20.

### E.  Laigon's Second FMLA Leave

In October 2008, at the same time he was resuming full work functions, Laigon's medical condition began to deteriorate.  DX E at 72-73.  He experienced numbness, tingling, and shooting pains in his left arm that rendered him unable to type.  Laigon also suffered problems with his back and neck, including stiffness, spasms, and tightness in his neck that caused headaches.  Most problematically in Laigon's estimation was the fact that he was having difficulty maintaining his balance and was "falling all over the place."  Id. at 32-34; DX I at 87.

Laigon's condition worsened and, on December 22, 2008, Laigon stopped coming to work.  DX I at 86.  On January 26, 2009, Laigon applied for a second FMLA leave to commence retroactively on December 22, 2008 and to last until May 18, 2009.  DX P (1/26/09 PMHCC Request for Family & Medical Leave).  Laigon had not contacted anyone at PMHCC to let them know that he had been

missing work.  DX I at 89.  That day, Sheaffer sent an e-mail to
RuthAnn Fehlinger in PMHCC's payroll department inquiring about
the leave time available to Laigon, noting that Laigon's bank of
available days did not reflect a "lengthy absence from the office
due to his physical health" over the preceding several weeks, and
stating that Laigon had informed Sheaffer that he would need at
least two more months of leave time.  Fehlinger responded that
she had "only learned late last week that [Laigon] has been out"
but that she had "no dates of reference."  She asked Sheaffer if
Laigon was "still on a 5-day/6-hour schedule (30 hours)," and
told Sheaffer that she would get back to him.  DX Q (1/26/09 E-
mails Between Sheaffer & Fehlinger).

        As part of his second FMLA leave request, Laigon again
submitted to PMHCC a Fitness for Duty/Return to Work
Certification completed by his doctor.  The medical form stated
that Laigon was suffering from progressive cervical myelopathy
with ambulatory dysfunction and upper extremity weakness.  It
further stated that Laigon was scheduled to have cervical
decompression and fusion surgery on February 10, 2009.  Laigon's
physician, Dr. Hilibrand, estimated that the dates of Laigon's
incapacity due to his condition would be December 22, 2008
through May 18, 2009 and stated that, during that period, Laigon
"will be fully disabled."  The form also asked the physician to
check a box indicating whether the employee would be able to

return to work at "Full Duty (with no restrictions)" or at "Partial Duty with restrictions."  Laigon's doctor did not check either box.  DX R (2/4/09 PMHCC Fitness for Duty/Return to Work Certification).  PMHCC granted Laigon's request.  DX I at 89.

Laigon underwent two surgeries, on February 10 and June 9, 2009.  DX E at 77-78.  Following the first surgery, for at least some period of time, Laigon became wheelchair bound. Id. at 28-29.  PMHCC extended Laigon's FMLA leave into the summer of 2009 to accommodate his ongoing health issues.  DX C at 21-23.

### F.  Laigon's Other Disability Benefits

On February 22, 2009, Laigon applied for Short-Term Disability ("STD") benefits through PMHCC.  His application stated that he was unable to perform "basically all duties" as a result of his condition and that he expected to return to work on a part-time basis on May 18, 2009.  He did not estimate on the form when he would be able to resume working full-time.  DX S (2/22/09 Claim for Income Protection Benefits - Claimant's Stmt.).  Dr. Hilibrand also submitted a form in support of Laigon's claim for STD benefits.  On the form, Dr. Hilibrand stated that he had not advised Laigon to return to work and that Laigon's "weakness" and "balance problems" prevented him from resuming job functions.  Hilibrand wrote that he anticipated Laigon would be able to return to work on June 20, 2009, although

the form did not state whether the return to work could be at full capacity or with restrictions. DX U (Claim for Income Protection Benefits - Attending Physician's Stmt.). Laigon was granted STD benefits on March 10, 2009, which were paid retroactively from January 21, 2009 through March 24, 2009. PMHCC received a copy of the awards notification. DX T (3/10/09 Letter from Beatty to Laigon).

Following the termination of STD benefits, Laigon applied for Long-Term Disability ("LTD") benefits using paperwork he had received from PMHCC. He was approved for LTD benefits, and received those sums until settling his claim with the benefits provider at some date prior to his deposition in connection with this matter on March 9, 2012. DX I at 89-92.

When Laigon left work on FMLA leave in January 2009, PMHCC had also recommended that he apply for Social Security disability ("SSDI") benefits, in case his leave lasted longer than anticipated. On June 9, 2009, Laigon applied for SSDI benefits. Id. at 89, 92. He subsequently filed a worksheet in support of his application on September 19, 2009. Laigon stated on the worksheet that he could no longer work due to his medical issues. He also claimed that he had difficulty using his hands, sitting, concentrating, completing tasks, and that he suffered from constant pain and fatigue, requiring him to "lay and rest" one to two times per day. DX V (Function Report - Adult). The

Social Security Administration ("SSA") approved Laigon's application on October 20, 2009 and retroactively awarded Laigon payments beginning in June 2009 and lasting five to seven years. DX W (10/20/09 SSA Notice of Award). According to Laigon, that benefits award period corresponds to a SSA categorization of "medical improvement not expected." DX I at 94.

Laigon did not at any time request from PMHCC a one-year, unpaid personal leave available on a discretionary basis under PMHCC policy. Id. at 95-96. PMHCC's executive director, Dr. Bernard Borislow, is unaware of Laigon ever requesting any other sort of accommodation for a disability. DX C at 23.

G. Laigon's Termination

On June 30, 2009, Laigon e-mailed Sheaffer to inform him that he had applied for SSDI benefits. Laigon also stated in his e-mail, "I do intend on returning to work, but at this time can not give a valid time estimate." DX X (6/30/09 E-mail from Laigon to Sheaffer). As of a month later, in August 2009, Laigon still was not physically capable of returning to work, as he was "60 days postop." At that time, Laigon hoped to return to work but his doctors "couldn't tell [him] for sure" when he would be able to do so. He also realized that his period of FMLA leave had, by that time, expired. DX I at 103-04, 110.

In August 2009, the City was experiencing financial

difficulties and each department was "suffering from inadequate funding and looking for mechanisms and ways to reduce costs." DX C at 38. Laigon knew the City was having budget problems in 2009 and had been experiencing financial difficulties since 2001 when he was first hired by PMHCC. DX I at 44-45, 108. As part of the City's cost-cutting measures, the City stopped funding Laigon's position. DX C at 37-38. On August 17, 2009, PMHCC sent Laigon a termination notice, stating that his FMLA leave had expired on June 15, 2009, and that, due to budgetary considerations, his position had been eliminated by the City, effective August 1, 2009.[4] DX Y (8/17/09 Letter from Cleveland-Jackson to Laigon).

In his February 2012 answer to the defendants' interrogatories, Laigon confirmed that he remained "permanently disabled" and unemployed. DX Z (Pl.'s Answer to Interr. No. 1). Three months later, in May 2012, Laigon's doctor wrote a report in which he stated Laigon suffers from a "permanent disability" and that his "prognosis for recovery is poor." DX AA (5/23/12 Weisberg Report) at 5-6.

---

[4] The letter is dated "August 17, 2008." That appears to be a typographical error, as the parties agree that Laigon's termination occurred in August 2009.

II.  <u>Analysis</u>[5]

Laigon asserts two causes of action against PMHCC: one for interference with rights protected by the FMLA and one for discrimination on the basis of disability in violation of the ADA and PHRA.  The Court finds that no genuine issues of material fact exist with respect to either claim and that PMHCC is entitled to summary judgment on both.[6]


A.  <u>FMLA Claim</u>

The FMLA provides eligible employees with a statutory entitlement to up to twelve weeks of medical or family leave

---

[5] Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Court must consider the evidence in the light most favorable to the non-moving party.  Once a properly supported motion for summary judgment is made, the burden of production shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986).

[6] The amended complaint also names ten John Doe defendants, stating only that they are "individuals and entities currently unknown" but liable for violating Laigon's rights under the FMLA, ADA, and PHRA.  Am. Compl. ¶ 7.  "The case law is clear that fictitious parties must eventually be dismissed, if discovery yields no identities, and that an action cannot be maintained solely against Doe defendants."  <u>Hindes v. FDIC</u>, 137 F.3d 148, 155 (3d Cir. 1998) (quotation marks, citations, and alteration omitted).  Because the Court grants summary judgment in favor of the two named defendants in this suit and because Laigon has done nothing to identify the John Doe defendants, the Court will also dismiss with prejudice all claims against John Does 1-10.

during any twelve-month period.  29 U.S.C. § 2612(a)(1).  The
FMLA further mandates that an employee returning from qualifying
leave has the right "to be restored by the employer to the
position of employment held . . . when leave commenced" or "an
equivalent position with equivalent employment benefits, pay, and
other terms and conditions of employment."  Id. § 2614(a)(1).  A
separate provision of that statute bars any employer from
interfering with or denying its employee rights or benefits
conferred under the FMLA.  Id. § 2615(a)(1).  In order to assert
an interference claim against an employer, "the employee only
needs to show that he was entitled to benefits under the FMLA and
that he was denied them."  Callison v. City of Phila., 430 F.3d
117, 119 (3d Cir. 2005).

In his amended complaint in this action, Laigon alleged
that PMHCC violated his rights under the FMLA in several ways: by
failing to explain his benefits and leave rights under that
statute, failing to grant him FMLA leave, and "failing to
reinstate [him] to his position when he was cleared to return for
work."  Am. Compl. ¶ 41.  At oral argument, counsel for Laigon
clarified that Laigon now presses an FMLA claim that is narrower
in scope.  At this stage, Dr. Laigon argues only that PMHCC
violated his rights under the FMLA when it failed to pay him his
full salary between October and December 2008, despite the fact
that he was working at his full pre-leave schedule during this

period.  See 10/11/12 Hr'g Tr. at 9, 11, 18.

The Court assumes without deciding that failure to pay Laigon for the full hours he worked after returning from FMLA-qualifying leave constitutes a violation of the FMLA.  The problem for Laigon is that any such violation cannot be attributed to PMHCC.  Before returning to work in August 2007 after his first FMLA leave, Laigon provided PMHCC's human resources department with a medical return-to-work form in which his doctor recommended that he be limited to two hours of typing per day.  DX L.  PMHCC staff worked with Sheaffer and Laigon to design and implement a reduced work schedule to accommodate this limitation.  There is nothing in the summary judgment record demonstrating that PMHCC ever became aware between October and December 2008 that Laigon had returned to full-time work.  Indeed, Laigon's counsel admitted as much at oral argument.  10/11/12 Hr'g Tr. at 10.

Laigon never submitted to PMHCC human resources a medical form releasing him for full-time duty.  Nor did Laigon speak to anyone at PMHCC about the fact that he had resumed working a 37.5-hour workweek.  DX I at 68.  Even after realizing that his paychecks did not reflect the actual number of hours he was working, Laigon did not notify anyone in PMHCC's HR department to inform them that he was back on a full-time schedule.  To the contrary, Laigon submitted to PMHCC requests

for paid time off in October, November, and December 2008 stating that he was still working six-hour days. As a general matter, although PMHCC facilitated the human resources aspects of Laigon's job, no PMHCC staff oversaw Laigon's work on a daily basis, such that they would otherwise be aware of his schedule through their direct interactions. Id. at 24-25; DX C at 17. As late as January 26, 2009, when Laigon requested a second FMLA leave, PMHCC still believed he was working an 80% schedule. In response to a January 26 e-mail from Sheaffer regarding the amount of leave time then available to Laigon, an employee in PMHCC's payroll department asked if Laigon was still working "a 5-day/6-hour schedule (30 hours)." DX Q.

Laigon counters that PMHCC itself prevented him from making direct contact with its human resources staff and telling them of his new schedule. Laigon testified at deposition that, in September 2007, PMHCC HR officials "rebuk[ed]" him for trying to inform them that his supervisor had changed and had told him that all "official" information needed to be channeled through his current managers. In context, it appears that one or more human resources employees simply told Laigon that any changes in his reporting structure had to be confirmed by his supervisor. He was not barred from discussing all work issues with PMHCC human resources. See DX I at 55-58, 61-63. Moreover, Laigon in fact continued to communicate with PMHCC HR personnel into

October 2007 and discussed with them various leave and disability issues when it came time for his second FMLA leave in 2009.

The record does reflect that Laigon's supervisors in the City Managing Director's Office, Sheaffer and Steiker, knew that he wanted and was medically cleared to return to work without restrictions. In fact, Sheaffer was the one who finally asked Laigon to resume his full work schedule and oversaw Laigon after his transition to full-time status.[7] Sheaffer assured Laigon that he would resolve any issues with PMHCC's payroll department, although he appears not to have done so. It was also Sheaffer to whom Laigon spoke when he noticed that he was not being paid for all of the hours he was working. Finally, Sheaffer instructed Laigon to record on his requests for paid time off that he was working six hours per day, even though he was, by that time, working seven-hour days.

Just because Sheaffer and Steiker knew about and were involved in Laigon's return to full-time employment does not mean that PMHCC was also aware of his changed work schedule, though. Steiker and Sheaffer were, after all, employees of the City, not PMHCC. There is also nothing in the record to suggest that Steiker or Sheaffer ever informed anyone at PMHCC that Laigon was medically cleared for or actually resumed a full work schedule. Laigon has offered no legal or factual basis for imputing his

_____

[7] By that time, Steiker had left her job in the City Managing Director's Office. See DX I at 25.

supervisors' knowledge to PMHCC.[8]  Accordingly, his FMLA claim

against PMHCC must fail.


    B.    ADA and PHRA Claims

        The ADA prohibits an employer from, among other things,

"discriminat[ing] against a qualified individual on the basis of

disability in regard to . . . discharge of employees . . . and

other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a).

        A court reviewing a claim of discrimination under the

ADA must apply the burden-shifting framework of McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  Shaner v. Synthes, 204 F.3d

494, 500 (3d Cir. 2000).  Under that evidentiary scheme, the

plaintiff has the initial burden of making out a prima facie case

of discrimination.  Id.  If he does so, the burden then shifts to

the defendant to articulate some legitimate, non-discriminatory

reason for the employment action.  Id.  Once that burden of

production has been satisfied, to survive a motion for summary

_____

        [8] At oral argument, Laigon's counsel argued that Sheaffer
was, at all times, an agent of PMHCC.  See 10/11/12 Hr'g Tr. at
14-15.  Laigon did not, however, include an argument based on
agency principles in his summary judgment papers, and such issues
have not been briefed or properly presented to the Court.  For
its part, PMHCC has consistently contested the assertion in
Laigon's amended complaint that Sheaffer was its
"representative."  See Am. Compl. ¶ 14.  PMHCC specifically noted
in its opening brief that Sheaffer is not an employee and argued
that Laigon has "presented no evidence showing PMHCC exercised
control or had any right to exercise control over [Sheaffer]."
Def'ts' Br. at 13.

judgment, the plaintiff must either discredit the employer's proffered rationale or adduce evidence demonstrating that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 501 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999)) (quotation marks and citations omitted).

The PHRA is co-extensive with the ADA, and claims under each are analyzed in an identical manner. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

### 1.  Laigon's Prima Facie Claim

To make out a prima facie discrimination claim under the ADA, a plaintiff must show that he: (1) has a disability within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an adverse employment action. Id. (citing Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998)).  Here, PMHCC makes no argument with respect to the first and third elements of Laigon's prima facie claim.  PMHCC argues only that Laigon has failed to proffer evidence from which a reasonable factfinder could conclude that he was qualified to perform the essential functions of his job at the time he was terminated.  See Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006) ("The determination of whether

an individual with a disability is qualified is made at the time
of the employment decision, and not at the time of the
lawsuit."). Laigon acknowledges that, after his second FMLA
leave had run its course, he still needed time to recuperate
before he could perform the duties of his job, but that he could
have returned to his position if afforded such an accommodation.
See 10/11/12 Hr'g Tr. at 21.

The Court concludes that Laigon has not presented
evidence demonstrating that he ever requested a reasonable
accommodation from PMHCC or that he was capable of performing the
essential aspects of his job at any point relevant to this suit,
with or without such an accommodation. Laigon, therefore, cannot
meet his prima facie burden for a claim of discrimination on the
basis of disability.


a. Lack of a Reasonable Accommodation

Laigon asserts that PMHCC discriminated against him
when it terminated him rather than accommodate his medical
impairment. He claims that, at all times, PMHCC was capable of
making reasonable accommodations such that he could have remained
an employee, but that PMHCC failed to make any adjustments to his
position. At oral argument, Laigon for the first time asserted
what form that reasonable accommodation should have taken. His
counsel argued that PMHCC should have held Laigon's position open

for a period of one year.[9]  Id. at 21-22.  PMHCC did maintain a
policy by which an employee could request a one-year unpaid
personal leave of absence.  DX BB.  Laigon's argument encounters
a fatal flaw, however, in that he never requested this or any
other reasonable accommodation.

Under the ADA, both employees and employers bear
responsibility for engaging in an interactive process to
determine an appropriate accommodation for an employee's
recognized disability.  Taylor, 184 F.3d at 312; Mengine v.
Runyon, 114 F.3d 415, 420 (3d Cir. 1997).  Before an employer is
obligated to participate in this dialogue, though, the employer
must be put on notice that the employee seeks a reasonable
accommodation.  Taylor, 184 F.3d at 313-14.  Notice does not have
to be formal or explicitly invoke either the ADA or the term
"reasonable accommodation"; rather, the test is whether "the
employee or a representative for the employee provides the
employer with enough information that, under the circumstances,
the employer can be fairly said to know of both the disability
and desire for an accommodation."  Id. at 313; see also Colwell
v. Rite Aid Corp., 602 F.3d 495, 506-07 (3d Cir. 2010).

---

[9] Laigon's counsel suggested that the accommodating leave
period should have concluded in August 2010, which he estimated
to be one year after the expiration of Laigon's FMLA benefits.
10/11/12 Hr'g Tr. at 22.  Of course, August 2009 is when Laigon
was terminated, not when his FMLA leave ran out.  According to
Laigon's termination notice, his period of unpaid leave under the
FMLA expired on June 15, 2009.  DX Y.

Laigon offers only bare, conclusory assertions, rather than record evidence, to demonstrate that he directly requested or impliedly made known his desire for an accommodation in the form of a one-year personal leave.  The closest Laigon ever came is when he informed Sheaffer, in a June 30, 2009 e-mail, that he intended to return to work.  Laigon did not, however, suggest that he would be able to do so within one year, from either that date or the date on which his second FMLA leave had commenced.  Rather, he noted that he could not venture a guess as to when he would be in a condition to resume his job.  Laigon certainly did not ask or intimate that he would like to request a one-year leave of absence, which, pursuant to PMHCC policy, will only be considered "upon request."  DX BB.  Indeed, PMHCC's executive director, Dr. Borislow, testified that he is unaware of Laigon ever requesting any accommodation for a disability.  DX C at 23.

Laigon also cannot impute discriminatory animus based on PMHCC's failure to hold open his position long enough to allow him to recuperate, regardless of any stated personal leave policy.  Several courts have determined that "an open-ended disability leave is not a reasonable accommodation under the ADA where . . . the plaintiff does not present evidence of the expected duration of [his] impairment."  Krensavage v. Bayer Corp., 314 F. App'x 421, 426 n.1 (3d Cir. 2008) (citing Byrne v. Avon Prods., Inc., 328 F.3d 379, 380-81 (7th Cir. 2003)); see

_also_ <u>Robert v. Bd. of Cnty. Comm'rs</u>, 691 F.3d 1211, 1217-18 (10th Cir. 2012); <u>Gantt v. Wilson Sporting Goods Co.</u>, 143 F.3d 1042, 1047 (6th Cir. 1998); <u>Myers v. Hose</u>, 50 F.3d 278, 282-83 (4th Cir. 1995).  Despite espousing the hope that he would someday be able to return to work, at no point did Laigon give PMHCC any indication as to when his leave of absence might conclude, and PMHCC was not obliged to leave his position open with no end date in sight.  It is the FMLA that affords an employee the opportunity to take leave from his employment, and it is undisputed that Laigon was allowed medical leave in 2008-2009 longer than that to which he was statutorily entitled.  <u>See</u> <u>Byrne</u>, 328 F.3d at 381.

> b.  <u>Laigon's Total Disability</u>

Putting aside the issue of whether Laigon requested a reasonable accommodation, Laigon's prima facie claim also fails because he has offered no evidence demonstrating that a leave of one year, or a longer period, would have enabled him to return to work.

The Court of Appeals for the Third Circuit has recognized that an employee's claim to be "otherwise qualified" to perform his job under the ADA "necessarily relies on the fact that [the employee] was not totally disabled." <u>Motley v. N.J. State Police</u>, 196 F.3d 160, 167 (3d Cir. 1999); <u>see also</u>

Krensavage, 314 F. App'x at 425 ("A 'totally disabled' person, by
definition, cannot perform the essential functions of her job,
regardless of the accommodation.").  Here, the only reasonable
conclusion to be drawn from the evidence in the record is that
Laigon has been completely unable to work since commencing his
FMLA leave on December 22, 2008.  The Fitness for Duty/Return to
Work Certification submitted by Laigon's physician in connection
with his January 2009 FMLA leave request stated that Laigon "will
be fully disabled" until approximately May 18, 2009, when his
requested medical leave was set to conclude.  DX R.  When Laigon
applied for STD benefits on February 22, 2009, he also stated in
his application that he was unable to perform "basically all
[job] duties," although he anticipated being able to return to
work part-time on May 18, 2009.  DX S.

Laigon never provided PMHCC with notification that his
condition improved or that he was ready to return to work, even
in a restricted capacity.  Although he sent Sheaffer an email on
June 30, 2009, stating that he intended to return to work, he
could not provide any indication of when he would be physically
able to do so.  DX X.  In August 2009, almost eight months after
first going on a second medical leave, Laigon still was in no
condition to resume working and his physicians could offer no
estimate of when that might change.

The next month, in his application for SSDI benefits,

Laigon stated that he could no longer work; he had difficulty sitting, concentrating, completing tasks, following instructions, and using his hands; and he needed to "lay and rest" one or two times a day.  DX V.  The Supreme Court has stated that "a plaintiff's sworn assertion in an application for disability benefits that []he is, for example, 'unable to work' will appear to negate an essential element of [his] ADA case-at least if []he does not offer a sufficient explanation."  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999).  Laigon's argument that he was entitled to SSDI benefits in 2009 and could not "work" but was, or would soon be, "otherwise qualified" to resume his financial policy advisor position at PMHCC is seemingly contradictory.[10]

The Third Circuit has cautioned that a court may not rely on statements made in a SSDI application to per se bar apparently contradictory claims made later, in the course of the applicant's ADA suit, and that any such discrepancies must be analyzed giving due consideration to the particular factual context.  Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 272-73 (3d Cir. 2012); Motley, 196 F.3d at 166.  This is because SSDI determinations do not consider whether an applicant can perform

_____

[10] To be eligible for SSDI benefits, an applicant must demonstrate disability "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

his job functions after receiving a reasonable accommodation, and, therefore, construe an individual's inability to work differently than the ADA. <u>Motley</u>, 196 F.3d at 165.

Nevertheless, the other evidence in this case only confirms what was in Laigon's SSDI application: that he has not been in a position to work since December 2008. Indeed, in his answers to the defendants' interrogatories, dated February 13, 2012, Laigon confirmed that he remained permanently disabled and unemployed. DX Z. As recently as May 2012, Laigon's physician stated that Laigon's "prognosis for recovery is poor." DX AA. Simply put, Laigon has proffered no evidence demonstrating that his state of full disability, commencing in December 2008, ever improved. He, therefore, has not met his burden for establishing that he is "otherwise qualified" for his former position with PMHCC, either with or without an accommodation. <u>Motley</u>, 196 F.3d at 167.

### 2. <u>PMHCC's Legitimate Reason for Termination</u>

Even if Laigon could state a prima facie claim under the ADA and PHRA, PMHCC has offered a legitimate, non-discriminatory reason for terminating Laigon. <u>See Shaner</u>, 204 F.3d at 500. PMHCC argues that the City terminated Laigon's position for budgetary reasons. Laigon's termination notice, issued on August 17, 2009, stated that his FMLA leave had expired

and that his "position ha[d] been eliminated due to budgetary constraints."  DX Y.  Dr. Borislow has also given deposition testimony that the City's "funding for [Laigon's] position . . . was terminated and the position was abolished."  DX C at 15.  He further testified that Laigon's position was eliminated "at a time when there [were] financial cutbacks in the City of Philadelphia overall."  Id. at 38.

Laigon himself has testified that the City was experiencing budgetary problems at the time his position was eliminated and that these fiscal issues dated all the way back to 2001.  DX I at 44-45, 107-08.  This acknowledgment undercuts any claim that PMHCC's proffered non-discriminatory reason for terminating Laigon is false.

Laigon also offers only minimal, weak evidence in affirmative support of his pretext claim.  Laigon contends that budgetary considerations could not have motivated elimination of his position, relying on testimony from Borislow to argue that his was the only position at PMHCC abolished in the summer of 2009.  Laigon misstates Borislow's testimony, however.  At deposition, Borislow initially assumed that Laigon's position was funded by the City Managing Director's Office and stated that he did not believe that office cut any other positions within PMHCC at that time; he did not offer testimony as to the number of layoffs made by the City, as a whole.  The Court has not been

presented with any evidence regarding the number of employees working at PMHCC whose positions were funded by the Managing Director's Office. Without that information, it is unreasonable to conclude, as Laigon argues, that it "strains credulity" for the Managing Director's Office to trim its expenditures within PMHCC by terminating only one position. See Pl.'s Opp. at 8-9. Indeed, Borislow testified that "there weren't that many positions" at PMHCC funded by the Managing Director's Office. DX C at 38-39.

Furthermore, Borislow ultimately stated that he did not even know which City department funded Laigon's position. Id. at 40. Accordingly, the record does not reflect how many PMHCC employees drew their salary from the same funding stream as Laigon and how many of those individuals were terminated in the summer of 2009. Thus, Laigon cannot demonstrate that he was the only one of his comparative pool to be terminated from PMHCC in the summer of 2009, cutting off his inferential argument that he was discriminatorily targeted for termination, rather than fired due to budgetary considerations.

More fundamentally, Laigon has produced no evidence refuting Borislow's testimony that the City, rather than PMHCC, decided to eliminate funding for Laigon's position. PMHCC, therefore, cannot be held liable for Laigon's termination, whatever motivation lay behind it.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant the defendants' motion for summary judgment.  An appropriate order issues separately.